# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

SEP 16 2019

JEFFREY P. COLWELL
CLERK

Civil Action No. _____
(To be supplied by the court)

TERRENCE AUDRE MCNEAL _____, Applicant,

v.

THE PEOPLE OF THE STATE OF COLORADO _____, Respondent,
(Name of warden, superintendent, jailer, or other custodian)

and

The Attorney General of the State of: Colorado _____, Additional Respondent.

*(Note: If you are attacking a judgment that imposed a sentence to be served in the future, you must fill in the name of the state where the judgment was entered. If you are attacking the execution of your sentence and not the validity of a state conviction or sentence, you must file an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. If you are attacking the validity of a judgment entered in a federal court, you must file a motion pursuant to 28 U.S.C. § 2255 in the federal court that entered the judgment.)*

---

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

## A.   APPLICANT INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address.  Failure to keep a current address on file with the court may result in dismissal of your case.*

TERRENCE MCNEAL #159282, UNIT 4B STERLING CORRECTIONAL
(Applicant's name, prisoner identification number, and complete mailing address)

FACILITY, P.O. Box 6000, STERLING, COLORADO 80751

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

____   Pretrial detainee
____   Civilly committed detainee
____   Immigration detainee
_X_   Convicted and sentenced state prisoner
____   Convicted and sentenced federal prisoner
____   Other: *(Please explain)* _____

## B.   RESPONDENT(S) INFORMATION

THE PEOPLE OF THE STATE OF COLORADO
(Respondent's name and complete mailing address)

_____

## C.   CONVICTION UNDER ATTACK

Name of the court that entered the
judgment of conviction:            ARAPAHOE COUNTY DISTRICT COURT

Date the conviction was entered:   AUGUST 16, 2012

Case number:                       2011CR786

Length and type of sentence:       TWO CONSECUTIVE SENTENCES OF LIFE

Are you serving any other sentence?   _X_ Yes ___ No *(check one)*

2

Offense(s) you were convicted of committing:

FIRST DEGREE MURDER(2 COUNTS) FIRST DEGREE BURGLARY(2 COUNTS)SECOND DEGREE KIDNAPPING AGGRAVATED ROBBERY(2 COUNTS) THEFT(2 COUNTS) CONSPIRACY(7 COUNTS)

What was your plea?

NOT GUILTY

Kind of trial:

X Jury ___ Judge only (*check one*)

## D.    DIRECT APPEAL

Did you file a direct appeal?

X Yes ___ No (*check one*)

Name of the court in which the direct appeal was filed:

COLORADO COURT OF APPEALS

Date and result of direct appeal:

FILED AUGUST 5, 2015, SENTENCE AFFIRMED

Did you seek review in the state's highest court on direct appeal?

X Yes ___ No (*check one*)

Date and result of review in the state's highest court:

FILED APRIL 13, 2017, CERTIORARI DENIED AUGUST 21, 2017

If you did not file a direct appeal, explain why:

N/A

## E.    POSTCONVICTION PROCEEDINGS

Have you initiated any other postconviction proceedings in any state court with respect to the judgment under attack? X Yes ___ No (*check one*).

*If your answer is "Yes," complete this section of the form. If you have initiated more than one postconviction proceeding, use additional paper to provide the requested information for each prior proceeding. Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "E. POSTCONVICTION PROCEEDINGS."*

Name and location of court:

DISTRICT COURT, ARAPAHOE COUNTY
7325 SOUTH POTOMAC STREET, CENTENNIAL, COLO. 80112

Type of proceeding:

PETITION FOR POST-CONVICTION RELIEF PURSUANT TO COLORADO CRIM. P. 35(C)

Date filed: _August 2018_

Date and result: _Denied 9/20/2018_

Did you appeal? ___ Yes _X_ No (*check one*)

Date and result on appeal: _N/A_

Did you seek review in the state's
highest court? ___ Yes _X_ No (*check one*)

Date and result: _N/A_

## F.    STATEMENT OF CLAIMS

*State clearly and concisely every claim you are asserting in this action. For each claim, specify the right that allegedly has been violated and all facts that support your claim. If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "F. STATEMENT OF CLAIMS."*

*WARNING: If you fail to assert all of your claims in this application, you may be barred from presenting additional claims at a later date.*

CLAIM ONE: THE COURT OF APPEALS ERRONEOUSLY HELD THAT THE TRIAL COURT DID NOT VIOLATE MR. MCNEAL'S RIGHTS TO A FAIR TRIAL AND IMPARTIAL JURY WHEN IT REFUSED TO INQUIRE INTO ALLEGATIONS OF JURY MISCONDUCT AND THEREBY ALLOWED SOME JURORS TO PRE-DELIBERATE BEFORE MR. MCNEAL HAD BEEN GIVEN A CHANCE TO PRESENT HIS EVIDENCE AND BEFORE THE COURT HAD INSTRUCTED THE JURY AS TO THE APPLICABLE LAW.
SEE EXTRA PAGES
LABLED (F) STATEMENT
OF CLAIMS 1-28

4

### G.   EXHAUSTION OF STATE REMEDIES

*WARNING: You must exhaust available state remedies before filing a habeas corpus action in federal court pursuant to 28 U.S.C. § 2254. Your case may be dismissed if you have not exhausted available state remedies.*

Did you fairly present each claim asserted
in this action to the state's highest court?   **X** Yes ___ No (*check one*)

If you answered "No," please identify which claim(s) have not been fairly presented to the state's highest court and explain why:  N/A

### H.   PRIOR FEDERAL ACTIONS

Have you filed any prior actions in any federal court challenging the same conviction or sentence under attack in this action? ___ Yes **X** No (*check one*).

If the instant action is a second or successive application, have you obtained authorization from the United States Court of Appeals for the Tenth Circuit for this court to consider the application? ___ Yes **X** No (*check one*).

*Complete this section of the form if you have filed a prior federal action challenging the same conviction or sentence under attack in this action. If you have initiated more than one prior action, use additional paper to provide the requested information for each prior action. Please indicate that additional paper is attached and label the additional pages regarding prior actions as "H. PRIOR FEDERAL ACTIONS."*

Name and location of court:   N/A

Case number:   N/A

Type of proceeding:   N/A

Claim(s) raised:   N/A

Date and result: (attach a copy if available)   N/A

Result on appeal, if appealed:   N/A

## I.   TIMELINESS OF APPLICATION

*If the judgment of conviction or the sentence under attack became final more than one year prior to the commencement of this action, explain why the application is not barred by the one-year limitation period in 28 U.S.C. § 2244(d).  If additional space is needed, use extra paper to explain your answer.  Please indicate that additional paper is attached and label the additional pages regarding timeliness as "I. TIMELINESS OF APPLICATION."*

N/A

## J.   REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "J. REQUEST FOR RELIEF."*  MR. TERRENCE AWONE MCNEAL RESPECTFULLY REQUESTS THAT THIS COURT GRANT HIS APPLICATION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. 2254, VACATE THE JUDGMENT OF CONVICTION ON DOCKET NUMBER 11CR786, REMAND THE CASE TO THE DISTRICT COURT OF ARAPAHOE COUNTY AND ORDER A NEW TRIAL.

## K.   APPLICANT'S SIGNATURE

I declare under penalty of perjury that I am the applicant in this action, that I have read this application, and that the information in this application is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this application: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the application otherwise complies with the requirements of Rule 11.

_____
(Applicant's signature)

9/12/19
(Date)

(Form Revised December 2017)

**1.)** **The court of appeals erroneously held that the trial court did not violate Mr. McNeal's rights to a fair trial and impartial jury when it refused to inquire into the allegations of jury misconduct and thereby allowed some jurors to pre-deliberate before Mr. McNeal had been given a chance to present his evidence and before the court had instructed the jury as to the applicable law.**

**A. Background**

After swearing in the jury, the court gave the jury preliminary instructions,     including:

- "You need to keep in mind throughout the course of this trial that the defendant is presumed innocent and has no burden in the case;"
- "You should not discuss the case among yourselves or with anyone else; and,
- "Keep an open mind throughout the course of this trial and not to arrive at a final decision until you have been released back for deliberation in the case,"
(R. Tr. 7/31/12, pp11, 14,221-22)

On the sixth day of trial, juror Bryce contacted the bailiff before lunch because he was wondering why the court did not respond to a

message he left on the bailiff's answering machine. (R. Tr. 8/7/12, PP 244-45). Bryce wanted to talk to the court personally, but the court told him through the bailiff that they could not talk outside the presence of the parties. Further the court told Bryce if he was uncomfortable meeting with the parties, he could reduce his concerns to writing and submit them to the court for consideration after lunch break.

The court listened to Bryce's message and-for some unknown reason- destroyed it. The court "paraphrased" the message for the record as " a rather long, rambling message concerned about some sort of, I guess, glances or some observations [Bryce] made of the in-court deputies from his perspective looking excessively at him and making faces at him."

After the court released the jury for the day, Bryce submitted a note to the court, the note said:

I want to be taken off the jury due to stress. I have not had a drink for five years, making me want to drink. I need to be removed for my health. Be dismissed today!

(Id.; PR, v3, P500)

The next morning, the prosecutor moved to dismiss Bryce from the jury. (R. Tr. 8/8/12, P5). Contrarily, the defense moved the court to first question Bryce "To get on the record directly from him the exact nature of his concerns," and then, if necessary, inquire of the entire panel. The court did as the prosecutor requested and dismissed Bryce without question. After Bryce's dismissal the defense then sent it's investigator to do what the court refused to do- get information as to why, after six days of trial, Bryce was stressed.

In pertinent part, Bryce told the investigator that he was feeling stressed  because the other jurors were (1) Discussing limiting the number of jury questions, and he asked a lot of questions; (2) Discussing witness testimony, in the form of "Minor details mixed into general conversation;" (3) Engaging in pre-deliberations, i.e., Discussing "how the law normally goes" and allowing "parts of the trial" to "accidently slip out;" (4) Not serious and just wanted to get the case over with; and (5)compromising his "strength to hold out." (See PR, v3, PP 506-08). Bryce referred to 1 through 5, supra, as "little snowballs." The investigator put this information into an affidavit, and the defense filed it with the court.

A few days later, when the court finally allowed defense counsel to argue the issue, defense counsel moved the court to inquire of the jurors pursuant to *Harper v. People, 817 P.2d 77 (Colo. 1991)*, Due to the statements in the affidavit. (R. Tr. 8/10/12, PP 54-55). The court denied the motion and held, in pertinent part:

I am dealing with 606(A), I think it is appropriate in the event that the court receives information that a juror individually or collectively is acting improperly....That, obviously, is open for immediate investigation. But the affidavit submitted here by the investigator for the defense in the matter supports neither conclusion. There is insufficient information here to even raise the specter that the jury is in some way acting improperly......

In this particular matter, there has been no indication whatsoever in the affidavit through the statements given by Mr. Bryce in his emotional state to this investigator that there was any sort of impropriety being engaged in by any of the jurors. The best I have here in terms of the concerns is that stuff is leaking out, "little snowballs" have been taking place, but these

are not defined at all in terms of Mr. Bryce's statement to the investigator. So I do not find that

to be sufficient little snowballs that occurred, that was not further defined, and stuff leaking

out, which essentially was left undefined as well, he does indicate minor details are mixed into

the general conversation, I find that since this affidavit itself is premised upon statements made

by this emotionally distraught juror that there should be questions as to how much weight I

should give to these particular comments as well, and I don't find it somewhat suspect what

comments were made by Mr. Bryce.(Id. At 67-70) (emphasis added). Thereafter, since Bryce

recorded much of the jury misconduct in his notebook, defense counsel moved the court to

include the notebook in the record. (Id. At71; see PR, v3, P507). The court denied the request

and claimed that Bryce's notes, like his recorded message, were "immediately destroyed." (Id.)

### B. Law and Analysis

The due process clauses of the United States and Colorado constitution's

guarantee every criminal defendant the right to a fair trial, including an impartial

jury. *U.S. Const. Amends. VI, XIV; Colo.Const. Art.II, 16, 25; Ross v. Oklahoma,*

*487 U.S. 81, 85(1988); Bloom v. People, 185 P.3d 797, 805(Colo.2008).* "That

right may be violated if....the court is made aware of possible juror misconduct

and fails to investigate that allegation." *People v. Harmon 284 P.3d 124, 127-28*

*(Colo. App. 2011) (citing Dunlap v. People, 173 P.3d 1054, 1090-91(Colo.2007).*

When a juror or jurors engage in premature deliberations, it is considered

juror misconduct because it jeopardizes a defendants due process rights. *People*

*V. Preciado-Flores, 66 p.3d 155, 66(Colo. App.2002) (citations omitted).*

The court of appeals decision in *Harmon, Supra*, is instructive to the issues here. In Harmon, defense counsel argued to the jury in opening statements that his client was not guilty of any charges-intentional or otherwise- But said, "if at the end of this trial you conclude that the way Jamie Harmon was bathing his daughter was negligent or careless, the defense live with that kind of conclusion." *Harmon, 284 P.3d at 127*. Thereafter, one of the jurors submitted a note to the court that suggested he engaged in pre-deliberations, decided Mr. Harmon was guilty, was annoyed with the extensive questioning and just wanted to get the case over with:

I wish to ask why it is necessary to spend all this time calling witness and going round and round on points and facts that both sides agreed to in their opening remarks. It would seem that the disagreement is only over what level of guilt is indicated. Can not the rest be stipulated? Can we not focus on the distinctions of motive and actions? Id. Over the defense's objection, the court took no action as a result of the juror note and the jury convicted Mr. Harmon of knowing or reckless child abuse, Id.AT 126-27. Upon review, the court of appeals held that the trial court deprived Mr. Harmon of his constitutional right to a fair trial when it failed to take action-I.e., excusing the juror, declaring a mistrial, or, at the very least, questioning the juror-after receiving the juror note. Id.

Here, the trial court deprived Mr. McNeal of his constitutional rights to a fair trial when it failed to take action-I.e., questioning the jury about misconduct alleged in Bryce's affidavit – to determine whether the jurors were engaging in pre-deliberations, and if so, whether the pre-deliberations effected Mr. McNeal's constitutional rights.

Like the statements in Harmon, some of Bryce's statements are subject to differing interpretations. See. Harmon, 284 p.3d at 128. For example, the following statements "fairly" suggest that some members of Mr. McNeal's jury engaged in pre-deliberations, decided Mr. McNeal's was guilty, were annoyed with the extensive witness questioning, and just wanted to get the case over with:

- Bryce said that he overheard the other jurors talking about "how the law normally goes" and "parts of the trial are accidently slipping out;"
- Bryce said he was stressed because the other jurors were discussing limiting the number of jury questions that could be asked of each witness, and he asked "a lot of questions;" and Bryce said the other jurors were concerned about ensuring the trial ends on time, flights needing to be caught, and one juror couldn't "wait until [the trial] is over to write a book"
  (See PR, v3, pp. 506-08)).

Thus, as in Harmon, the trial court abused its discretion because it was required "to take some action to correct any.....misunderstanding [of a juror's duty to reserve judgment until deliberations], to avoid the possibility of allowing.....biased juror[s] to sit" on Mr. McNeal's jury. Harmon, 243 p.3d at 128 ; see also Smith v. Phillips, 455 U.S. 209,217 (1982) (Due process

means "a jury capable and willing to decide the case solely on the evidence before it and a trial

judge, ever watchful to prevent prejudicial occurrence's and to determine the effect of such

occurrence's when they happen.")(emphasis added) ; United states v. Angulo, 4 f.3d  843, 848

(9th Cir. 1993)("because even a single partial juror violates a defendants constitutional right to

fair trial, a judge must always act diligently to preserve that right.")

The court of appeals held that the trial court did not abuse its discretion when it refused

to inquire of the remaining juror's. (Slip op., p22). Specifically, the court held in pertinent part,

that (1) Bryce's affidavit "Did not specifically describe pre-deliberation by the other juror's" and

did "not indicate that the other juror's had reached a conclusion before the case was submitted

for deliberations;" and (2) the trial court was entitled to doubt the truthfulness of the affidavit

because Bryce "declined to return and again address the court," and "the affidavit, an

investigator for the public defender's office, was not a neutral source."

(Slip OP., pp23-24). The court is incorrect.

First the law does not require definitive proof of juror misconduct before a trial court

can conduct a jury inquire. As it stands today, the law requires a "fair suggest [ion]" of pre-

deliberations to require inquiry of the jurors. See Harmon, 284 p.3d at 127-28(addressing

interpretations of juror statements that fairly suggested juror pre-deliberations, as opposed to

analyzing the statements in a light most favorable to the state).

Second, other than bias, the trial court had no reason to doubt the truthfulness of

Bryce's affidavit. Indeed, to the extent the court doubted the statements in the affidavit, it had

a duty to inquire to get to the truth of the matter. See Hayes v. State, 647 SO.2d 11, 14 (Ala.

Crim. 1994) (noting that a trial court has a duty to conduct a reasonable investigation of alleged

jury irregularities, including a painstaking and careful inquiry into the alleged juror misconduct).

**2.)** **The court of appeals erroneously held that the trial court did not**

**violate Mr. McNeal's right's to a fair trial and impartial jury review**

**when it denied his challenge for cause to juror Sayrie because Sayrie**

**demonstrated during voir dire that he was biased in favor of the**

**prosecution.**

    A.   <u>Voir Dire</u>

    Prospective juror Knaru Sayrie indicated on his jury questionnaire that he

was "not sure" whether he could be fair and impartial in this case

because his "younger brother was shot 7 times [by] gang members." This

being a case that involved gangs, guns, and shooting- and the fact that

the prosecutors and media were ramping up the James Holmes spectacle

in another courtroom in the same courthouse – prompted defense

counsel to query the venire about the prevalence of gun violence in our

society:

           [Prospective juror Sayrie:] I had a brother that was a

           victim of violence and survived being shot 7 times,

and...being close to him....it....brought up that memory and things in that nature.

[Prospective juror Sayrie:] It was initiation day for gang members and [Sayrie's young brother] was a victim of that, he and a couple of other people. And....anytime something like that happens to your family.... It's a hard pill to swallow, and you....you let the court... take its course, but at the same time there is anger that is there.

[Defense counsel:] I can understand that. May I ask how long ago it was?

{Prospective juror Sayrie:] That was in"98", but he still suffers from the wounds. I mean, they amputated his arm, his colon is out, things like that, you know.

[Defense counsel:] So 14 years ago, but it doesn't go away?

[Prospective juror Sayrie:]It doesn't go away.

[Defense counsel:] How do you feel?

[Prospective juror Sayrie:] I know as far as the victim is concerned, you know, you feel a little partial to the victims, because going through something like that myself

where my brother almost died, you know, it is kind of a

situation like that.

(R. Tr. 7/30/12, pp151-53) (emphasis added).

Based on this exchange, defense counsel challenged Sayrie for cause. (Id. At215). The

court denied the challenge:  The court: all right. Mr. Sayrie's responses indicated he could

provide a fair trial and rational analysis of all the evidence in the case and follow the

instructions of law. I never heard him indicate in any fashion he was bias or bent of mind

towards one side or the other in the case, so I didn't see grounds for the challenge for cause. He

remains as a juror in the matter.

(Id. At 216-17) (emphasis added). Sayrie ultimately served on Mr. McNeal's Jury.

### B. Law and Analysis

The Due Process Clauses of the United States and Colorado

constitution's guarantee a defendant's right to a fair trial. U.S. const.

Amends. V.VI, XIV; Colo. Const. Arts. II 16, 25; Morrison v. People, 19 p.3d

668, 672 (Colo.2000). In order for a defendant to have a fair trial, he or

she must be provided with an impartial jury. See Nailor v. People, 612

p.2d 79, 80 (colo.1980).

In accordance with these rights to a fair trial and impartial jury,

the accused has the right to challenge jurors for cause. Morrison, 19 p.3d

at 672. A trial court "must excuse" prejudiced jurors, biased jurors, and

all jurors who cannot, or will not follow the courts instructions. Id.;

Nailor, 612 p.2d at 80; people v. Russo, 713 p.2d at 362 (emphasis added). "This standard protects the interests of justice and promotes judicial efficiency." Nailor, 612 P.2d at 80.

Here, the trial court's abused its discretion when it refused to dismiss Sayrie for cause.

Contrary to the court's opinion, Sayrie did indicate he "was bias[ed] or bent of mind towards one side of the case or the other in the case." (R. Tr.7/30/12, pp. 216-17); see People v. Loggins, 981 P.2d 630, 633 (Colo. App. 1998) (Trial court's decision to deny a challenge for cause must be reversed if the record does not adequately support the decision.) Sayrie said that he would "feel a little partial to the victims"-or, in other words, he would be partial to the prosecution- because his brother was a victim of senseless gun/gang violence like the victims in this case. (See R. Tr. 7/30/12, P. 153)

Thereafter, while Sayrie did indicate that he could "listen to the evidence in its full entirety", (Id. At 155), (he did not demonstrate to the court that he could put aside his bias and render a fair and impartial verdict according to the laws and evidence presented at trial.); See People v. Fuller, 791 P.2d 702, 706 (Colo. 1990) (test for determining whether a prospective juror should be disqualified for bias is whether that person will render a fair and impartial verdict according to the laws

and evidence presented at trial.); 16-10-103(1)(J), C.R.S. (2010); Crim. P. 24(b)(x).

Indeed, this is not a situation where a prospective juror, after informing the court of his bias towards the victims, "unequivocally" assures the court that he would decide the case fairly and impartially based on the evidence presented in court, See People v. Taggart, 621 P.2d 1375, 1384 (Colo.1981)(finding that trial court properly denied challenge for cause to jurors who had initially expressed doubt as to their ability to remain impartial because later both jurors made a "clear and unambiguous concession...that they could and would be fair and impartial");People v. Fields, 697 P.2d 749,757 (Colo. 1984)(affirming trial courts denial of challenge for cause despite prospective juror's potential for bias because the prospective jurors potential for bias because the prospective juror stated "unequivocally that she would decide the case on the evidence and instructions of law as the court gives them.") Thus, the court violated Mr. McNeal's rights to a fair trial and impartial jury when it denied his challenge for cause to Sayrie and allowed Sayrie to serve on Mr. McNeal's jury. (R.TR. 7/30/12, PP216-17; 8/16/12, P8).

**3.)     Appellate counsel proved ineffective when he failed to raise blatant constitutional errors that occurred during trial on direct appeal.**

## A. <u>Background</u>

At a motions hearing on January 19, 2012, the prosecution attempted to introduce into the trial of Terrence McNeal statements codefendant Janelle Harris made to a Lawrence McNeal under 804(b)(3) as statements against interest. The defense objected stating that:

> "These are not statement of minimal impact. These are statements that are going to have a significant impact if they are admitted as they stand, and will be out there without any means to cross –examine Ms. Harris about any of these points that I have been talking to the court about."(R. Tr. 1/19/12,P.58,Lines 19-24)

The defense also states that:

> "This certainly is not a circumstance where the people are without any other means to attempt to establish these facts before the jury. (R. Tr. 1/19/12,P.59, 8-11)

In the people's response, DDA Antonopoulos states that:

> "Just what it comes down to is there were three people out in the field on that night, and that was Mr. McNeal, Ms. Harris, and the victim Tiffany Durst."

She goes on saying that:

If Ms. Harris makes herself unavailable by refusing to testify by asserting her fifth amendment

privilege, there is a part of this case that we cannot get to absent these statement." (R. Tr. 1/19/12. P.60, Lines 4-17) Judge Spear denied the peoples motion and I his ruling he stated:

> "it would be error for the court to permit these particular statements to be admitted in the process that the people outlined in their motion, having Ms. Harris testify through a third party."

He concludes by saying:

> "So I am not going to permit the prosecution to introduce Ms. Harris statements through Lawrence McNeal or through any other person who may have heard these statements even though she may be unavailable for trial ultimately in this matter."(R. Tr. 1/19/12, P.70 Lines 5-17)

However, during trial these statements were introduced via testimony of co-defendant Tiera Homes. The defense objected and subsequently moved for a mistrial pursuant to People v. Montoya, 753 P.2d 729, also citing to People v. James, 40 P.3d 36. (R. TR. 8/9/12, Pp.191, Lines 12-25, 192, Lines 1-7) Judge Spear denied the motion stating that:

> "The court was relying upon rule 801(D) 2 (E) to support the conclusion that the statements are not hearsay, they are statements of coconspirators either made during the course or in furtherance of the conspiracy." (R Tr. 8/9/12,P.192,Lines 8-13)

Mr. McNeal disagrees and contends that under that analysis the trial court made a constitutional error in admitting those statements.

**B.**      <u>Law and Analysis</u>

Crawford v. Washington holds that no testimonial hearsay can be admitted at trial unless the declarant is unavailable and the accused had a prior opportunity to cross-examine the declarant. In this case the trial judge had already stated in his denial of the people's motion mentioned earlier that he would not permit this type of hearsay evidence to be introduced at trial. Although Ms. Harris was unavailable at trial, she was never cross-examined by Mr. McNeal. The admission of these statements violates Mr. McNeal's 6th amendment right of confrontation and does not satisfy the state or federal confrontation clause. The state in petition for post-conviction relief ruling disagreed and said "Although defendant correctly notes that Ms. Harris was unavailable at trial and never cross examined, defendant mistakenly overlooks the non-testimonial nature of this statement." They cite People v. Trevizo, 181 P.3d 375 (Colo. App. 2007) (statements are only testimonial if their primary purpose is to explain past events rather than to describe ongoing criminal activity), but based off the testimony, that is exactly what the statements are doing. Ms. Harris is explaining what had already occurred and at no point does she speak about any other criminal activity ongoing or pending, thus making these statements testimonial.

Judge Spear stated that the statements fall under 801(D) 2 (E) in that they were made during the course of or in furtherance of the conspiracy.

C.R.S. 18-2-201 states that although a conspiracy need not necessarily terminate with the completion of its targeted crime, nor even the arrest of a conspirator, when it does terminate depends on the facts and purposes of such conspiracy. In this instance the conspiracy's objective was centered on Tiffany Durst as proven by the people through numerous witnesses that they introduced in the trial in order to chronicle the progression of the conspiracy. When specifically asked "what was the plan" Tierra Homes described in detail the original and revised plan targeting the eventual victim Tiffany Durst. (R. Tr. 8/9/12, P.80, 11-25, P.81, 1-25, P.82, 1-25, P.83, 1-13) when testifying about his interview with Lola Nicholas Det. Mehl was asked "what did she [Lola Nicholas] say Little Black wanted the two girls to help him do?" Detective Mehl then relayed her response which only involved doing something to a girl a "girl" (R.Tr.8/9/11, P.183, 11-17)

The witness Rashaud Hudson testified that immediately after witnessing a female in the trunk of the defendant's car, before leaving his presence McNeal stated "he was going to take care of business." (R. Tr. 8/8/12, P. 284, 15-25, P. 285, 1-11) The witness Tigee Jackson testifying that he was standing with Mr. Hudson and Mr. McNeal the whole time stated that Mr. McNeal said "were going to off this bitch" before leaving. (R. Tr. 8/13/12, P. 198, 1-20)

In people v. Burke, 37 Colo. App. 289, 549 P.2d 419 (1976), one witness established the existence of the conspiracy at the time of the burglary, but it did not establish the existence of a conspiracy approximately three days later when the declaration was made and no further evidence of a continuing conspiracy was offered. In McNeal's petition for post-conviction relief ruling the state said "although the court found that the conspiracy had concluded in Burke, defendant's situation is easily distinguishable and provides further support for the trial court's ruling." The state contends "if defendant is correct in noting that the conspiracy ended with the murder of Tiffany Durst, then it would have at least continued to the extent that they needed to drive away from the Spillway and depart from the scene of the crime."

However, that would imply either a previously expressed conspiracy to conceal the crime by the defendants prior to the murder or a subsidiary conspiracy to conceal the crime after its commission. The evidence of this case does not support any such notions. Furthermore, numerous rulings contradict the states contention. The court in state v. Yslas, 139 Ariz. 60 ruled once a substantial crime has been committed, a conspiracy should not be deemed operative merely because some of the conspirators act in concert to avoid detection. In Grunewald v. U.S., 353 us 391 justice Harlan of the United States Supreme Court explained: After the central criminal purposes of a conspiracy have been attained a subsidiary conspiracy may not be implied from circumstantial evidence showing merely that the conspiracy was kept a

secret and the conspirators took care to cover up their crime in order to escape detection and punishment.... Acts of covering up, even though done in the context of a mutually understood need for secrecy, cannot themselves constitute proof that the concealment of the crime after its commission was part of the initial agreement among the conspirators.

Here in McNeal's case, Ms. Homes established the existence of the conspiracy to kill Ms. Durst once the criminal episode began. However, Ms. Homes did not establish the existence of a conspiracy ongoing approximately forty-five minutes after the conclusion of the crime when the declaration was made. (R. Tr. 8/9/12,P.174, Lines 21-24) No further evidence of a continuing conspiracy was offered. Evidence provided via testimony of Ms. Homes proves that conspiracy has ended when Ms. Harris makes the statements in question. Furthermore, the statements themselves are describing the conclusion of the conspiracy and the outcome of the criminal episode that was born of the conspiracy so 801(D) 2 (E) was not used properly in admitting the statements in question. In fact, according to Ms. Homes, The next course of action the three defendants took was pay a social visit to a friend's house and upon leaving that friend's house, the conspiracy that led to the murder of Terrence George was born when the directive to go back to Tiffany's apartment was given, further proving that at the time the hearsay statement was made, the criminal conspiracy and the crimes the conspiracy

led to regarding Tiffany Durst was over. (R. Tr. 9/9/12, P.181, 24-25, P.182, 1-25, P.183, 1-24)

The trial judge made a constitutional error in admitting these statements in Mr. McNeal's trial under C.R.E. 801(D) 2 (E) as these statements were not made in the course of or in furtherance of a conspiracy. There can be no furtherance of a conspiracy that has ended and according to the testimony provided, all crimes with regard to Tiffany Durst were already accomplished when statements were made, the objective of the conspiracy was achieved and no other objective was presented at the time. Terence George was not yet introduced into the criminal episode and a prior conspiracy to conceal was not in existence. The only conspiracy entered into by the three defendants was over at this point. The judge said he would not allow Ms. Harris to testify through a third party and that is exactly what occurred here with Ms. Homes serving as the third party instead of Lawrence McNeal. As in the Burke case reversal is required because of Tiera Homes' hearsay testimony regarding what Janelle Harris told her occurred in the field where the victim was killed.

Mr. McNeal was represented on appeal by Michael Mattis #37869 who rendered ineffective assistance when he failed to raise this blatant constitutional error on direct appeal. The state asserts "had Mr. Mattis argued that these statements were improper hearsay on appeal, it is with fair assurances that the appellate court would have deemed the error harmless."

The state also argues "even if the trial court did err, excluding Ms. Harris'

statement would not have changed the outcome of the trial because the

admissible evidence against defendant was overwhelming to tie him to

Tiffany Dursts' murder. The state then mentions several key points in Ms.

Homes' testimony and two other witnesses, but fails to mention that the

only testimony close to eyewitness testimony the jury heard regarding who

actually killed the victim came from Ms. Homes via these statements. To

exclude these statements is to exclude the only witness to this crime.

Information provided to Ms. Homes via the coroner's report will not disclose

who killed the victim only how she died, the only way to say McNeal killed

the victim is via these statements. As this is the only means by which to

answer the question who killed the victim, these statements had a very

significant impact on the jury and the verdict they reached and that error

cannot be overlooked as harmless. By not challenging these inadmissible and

highly prejudicial statements on direct appeal, Mr. Mattis did not present a          | Commented [LL1]: |

sound and effective appeal. Ignoring this issue allowed  inadmissible

evidence with a direct link to the guilty verdict eventually handed down to go

unchallenged on appeal, prejudicing the defendant and rendering Mr. Mattis

ineffective.                                                       ✗ 4.)

**DEFENSE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF**

**COUNSEL WHEN IT FAILED TO INVESTIGATE, PREPARE A PROPER**

**DEFENSE FOR AND RAISE A PROPER OBJECTION TO THE**

**INTRODUCTION OF CELL PHONE TRACKING INFORMATION.**

## A. BACKGROUND

In April 2011, Terrance McNeal was charged with the murders of Tiffany

Durst and Terrance George. The prosecution's case heavily relied on witness,

specifically co-defendant Tiera Homes' testimony placing McNeal at the

crime scenes and McNeal's cell phone records corroborating the witnesses.

In an august 9, 2011 preliminary hearing Aurora Police detective Charles

Mehl stated:

"After I got a production of records request for Mr. McNeal's cell phone

from our crime analyst at the Aurora Police Department, I was provided a

map"

(R.Tr.8/9/11, P.59, 7-16)

Mehl than explains the map. (R.Tr.8/9/11, P.60, 2-24) No objection was

made by defense counsel as to the admissibility of the cell phone evidence.

On August 10, 2012 during trial, this evidence was presented to the jury

via testimony from FBI agent Scott Eicher:

DDA Cochran: So in this case were you asked to analyze the cellular

phone records or historical call detail records for two different

phones?(R.Tr.8/10/12,20-22)

Eicher then stated:

"I used these records to determine the date and time of the calls and the

cell site and sector used by the phones at the time the calls were made."(R.

Tr. 8/10/12, P.144, 20-22)

Eicher goes on to explain his method of utilizing two programs to map

the phone records. Map point "is actually sold to the public for planning your

vacation" and Google Earth. (R.Tr.8/10/12, P.145, 16-25, P.146, 1) these are

two highly accurate programs with near GPS precision. In fact, GPS

coordinates were used to "know exactly where it [McNeal's phone] was

being used on a specific call."(R.Tr.8/10/12, P. 148, 10-19)

Despite lack of objection by the defense counsel as to the inadmissibility

of this evidence, Mr. McNeal contends that tracking his movements through

his cellular phone was a gross invasion of his privacy and when the Aurora

Police Department acquired McNeal's phone records without a court order,

subpoena or search warrant, that constituted an illegal search and seizure

under the fourth and fourteenth amendments of the united states

constitution.

**B.  Law and Analysis**

In Carpenter v. United States 138 S.CT. 2206, prosecutors applied for

court orders to obtain phone records for Timothy Carpenters and several

other suspects. The purpose of these orders were to track Carpenter's

whereabouts at the time his alleged crimes occurred. The records for

were obtained and at trial an FBI agent offered expert testimony about

the cell site data. During this testimony, the agent produced maps placing

carpenters phone near some of the robbery scenes leading to his

conviction. Because Carpenters phone was near some of the robbery

scenes leading to his conviction. Because Carpenters phone records were

obtained without a search warrant that constituted an illegal search and

seizure and the case was later overturned.

On August 7/2012 during the trial of Terrence McNeal Clifton

Cobbs, a representative of cricket, McNeal's cell carrier was called to testify.

Cobbs never received a subpoena, court order or warrant to create Mr.

McNeal's call records. In fact, after obliging the Aurora Police Department's

production of records request mentioned earlier, Mr. Cobbs coupled the

records with a letter that "actually explains how to request these records."

(R. Tr. 8/7/12, P.91, 20-23) The letter even stated "you need either a criminal

grand jury or trial subpoena or a subpoena duces tecum or a search warrant

in order to get these records." (R. Tr. 8/7/12, P.92, 1-14)

The state in Mr. McNeal's petition for post-conviction relief

pursuant to Colorado criminal procedure rule 35(c) ruling asserts that Mr.

Cobbs' explanation of the letter he sent to law enforcement indicated "police

complied with a certain level of procedure in order to receive the records."

"Pursuant to Colorado law, a court may order the production of records if

probable cause is shown beforehand." The state adds "since a request for

production of records requires a judge to find probable cause and sign off on

the request, it is highly likely that a judge would have found probable cause

and signed off on a search warrant as well." The state refutes Mr. McNeal's

contention that no exigent circumstances existed that would allow law

enforcement to acquire his phone records without a warrant, subpoena, etc.

they cite to Riley v. California, 134 S. Ct. 2473, 2494, people v. Nelson, 296

P.3d 177, 185 and people v. Lewis, 957 P.2d 160, 169. All include examples of

exigent circumstances that would give law enforcement the power to

execute a warrantless search, however none of these examples have any

bearing on this case at all. The state notes "pursuant to information provided

to the police from a C.I., defendant indicated that he was going to kill Ms.

Homes and told the C.I. about the murder" and concludes "based upon the

information before the police at the time of the records request, the police

had justifiable cause to worry about the public safety of an alleged murder

suspect out of custody and worry for the safety of Ms. Homes. Accordingly,

exigent circumstances may have been found."  Mr. McNeal has been in

custody since 12/7/2010 and was interviewed by police 4 days prior. When

asked specifically about this interview and whether or not Mr. McNeal was a

suspect in the investigation at that time detective Mehl answered "no." (R.

Tr. 8/13/12, P.236, 19-21) The records were requested after this interview

and the results were received on 2/8/11. Information was not provided from

any C.I. inside the jail until 3/9/11 and based off of Mehl's testimony Janelle

Harris wasn't contacted until 4/9/11. (R. Tr. 8/9/11, P.68, 8-13) information

provided from that interview led to the contact of Ms. Homes on 4/11/11. (R.

Tr. 8/9/11, P.84, 5-12) By then the Aurora Police Department had Mr.

McNeal's records for some time before he was a suspect in what was a

missing persons case at the time of the records request. At the time of the

records request, law enforcement couldn't have possibly worried for the

safety of Ms. Homes as the state asserts, because prior to Ms. Harris'

interview, they didn't know she existed. According to detective Mehl, a judge

never signed any kind of warrant regarding this case until 4/13/11. (R. Tr.

8/13/12, P.252, 25, P. 253, 1) exigent circumstances couldn't possibly exist

because no information was known until Ms. Harris' interview later on. In the

carpenter case, the United States Supreme Court held "an individual

maintains a legitimate expectation of privacy in the record of his physical

movements as captured through CSLI.  Tracking a person through cell-site

location information (CSLI) is synonymous with the GPS tracking used in

United States v. Jones 132 S. Ct. 945. In fact, the united state supreme court

in Carpenter concluded that: "historical cell site records present even greater

privacy concerns than the GPS monitoring considered in Jones. They give the

government near perfect surveillance and allow it to travel back in time to

retrace a person's whereabouts", which was precisely what occurred in

McNeal's case. As in Carpenter, the records obtained from McNeal's wireless

carrier was the product of a search. The Aurora Police Department obtained

McNeal's records not via a warrant supported by probable cause or a

subpoena, but via a production of records request and without any exigent

circumstances occurring, that was an illegal search and seizure.

McNeal's was not a case in which the government's evidence was

indisputable as in United States v. Cronic 466 U.S. 648 whereas "a competent

attorney would have no reason to question the accuracy, authenticity or

relevance of this evidence." McNeal's defense team questioned the accuracy

of the technique Eicher used, even objecting to the records as hearsay and

objecting to them in map format as hearsay, but never questioned the

admissibility of the CSLI evidence regarding how they were acquired.

Without a warrant, court order or subpoena, this evidence was inadmissible

making Eicher's technique irrelevant.

The court in Rose v. Lundy, 455 U.S 509 (1982) ruled investigations

into lines of defense must include "an independent examination of the facts,

circumstances, pleadings and laws involved. Any potential line of defense

would be negated as the prosecution insists McNeal was with and using his

phone during the commission of this crime, making this evidence highly

prejudicial.

Under the sixth amendment of the United States Constitution, a

person accused of a crime has the right to "effective assistance of counsel."

The court in Adams v. United States ex rel McCann (U.S. N.Y. 1942) stated

"an accused must have the means of presenting his best defense. He must have time and facilities for investigation and for the production of evidence." The court in Powell V. Alabama concluded that "counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." This same court in Powell v. Alabama, 287 U.S. 45 (1932) further stated "even the intelligent and educated layman has small and sometimes no skill in the science of law."

The burden of investigating, researching and preparing a defense cannot be placed on the defendant. Counsel is not tasked with the responsibility of predicting the ever changing law, however, tracking through CSLI has been a contested issue in multiple courts, in multiple states culminating in eventual changes in the law in Maine, Minnesota, Montana, Tennessee, Utah and C.R.S. 16-3-303.5 in Colorado, but without knowledge of the law or of criminal procedure, McNeal could not even preserve this issue for appeal. The decision in the Carpenter case was not decided during McNeal's trial, however the line of cases leading to that decision including the Jones case was decided which would have given an attorney doing his due diligence a direction to argue the admissibility of these records with regard to the way they were acquired.

Defense counsels failure to argue this issue effectively allowed a witness equivalent to testify, unchallenged, to the whereabouts of the defendant and cannot be overlooked as harmless. Used in tandem with the

hearsay statements also being challenged in this habeas corpus action, these CSLI records provide the prosecution with a witness that cannot be cross examined.  Defense counsels failure to research the way McNeal's records were acquired, investigate whether the acquisition was legal and raise proper objection to the introduction of the prosecutions CSLI evidence allowed inadmissible and highly prejudicial evidence to be presented to the jury, thereby depriving Mr. McNeal of a fair trial.

Based off of the issues presented above Mr. McNeal requests that this court grant his writ of habeas corpus, vacate the judgment of conviction on docket number 11CR786, remand the case to the District Court of Arapahoe County and order a new trial.

COLORADO DEPT OF CORRECTIONS
Name: TERRENCE MONEAL
Register Number: 159632    Unit: 4
PO BOX 6000 STERLING CORRECTIONAL FACILITY
City, State, Zip STERLING, COLO 80751

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
ALFRED A. ARRAJ COURTHOUSE
901-19TH STREET ROOM A105

DENVER, COLO. 80294



U.S. POSTAGE ➤➤ PITNEY BOWES

ZIP 80751  $ 002.65⁰
02 1W
0001365920 SEP 13 2019

